## A. GUCKENHEIMER & BROS. CO. et al. v. UNITED STATES.*

(Circuit Court of Appeals, Third Circuit. February 3, 1925.)

No. 3222.

1. **Criminal law ⬅394—Owner of papers seized only could object to admission of evidence procured thereby.**

In prosecution against corporation and 13 individuals for conspiracy to obtain release of whisky from bond by means of forged permits, and to sell it unlawfully, in violation of Criminal Code, § 37 (Comp. St. § 10201), if seizure of corporation's papers was illegal under Fourth Amendment, its rights only were invaded, and it alone could object to introduction of papers in evidence.

2. **Criminal law ⬅394—Use in evidence of papers and records surrendered by wholesale liquor dealer on demand of prohibition agents held not unlawful.**

Where distillery company, doing wholesale liquor business under government license, surrendered its papers and records on demand of prohibition agents, surrender was in legal effect voluntary, and subsequent use of papers and records in prosecution for conspiracy was not result of search or seizure, violating Fourth Amendment.

3. **Criminal law ⬅814(5)—Refusing charge as to guilty knowledge of defendants held not error.**

Where evidence in prosecution for conspiracy to obtain whisky from bond by forged permits and its unlawful sale showed that, if defendants did acts charged, they could not have believed permits were lawful, refusal to charge that, if any defendant did not know that deliveries were made on forged permits, finding of not guilty would be warranted, was not error.

4. **Conspiracy ⬅43(2)—Indictment charging conspiracy held sufficient.**

Indictment charging that certain persons conspired together with certain other persons *held* sufficiently to charge that persons in first group conspired with those in second group, and that all conspired to commit offenses charged.

5. **Conspiracy ⬅47—Not necessary to prove accused knew and participated in every action of every other conspirator.**

To sustain conviction for conspiracy to obtain whisky from bond by forged permits and its subsequent sale, it was not necessary to prove that accused knew and participated in every action of every other conspirator, but it was sufficient to show that he agreed to take part in conspiracy.

*Certiorari denied 45 S. Ct. 509, 69 L. Ed. ——.

**6. Conspiracy ⬤═47—Evidence held sufficient to warrant conviction for conspiring to obtain bonded whisky by forged permits and subsequent sale and delivery thereof.**

Evidence *held* sufficient to warrant conviction of federal prohibition agent for conspiring to obtain bonded whisky by forged permits and its subsequent sale and delivery.

**7. Criminal law ⬤═782(1)—Instruction that evidence was sufficient to sustain conviction, even if jury disregarded certain testimony, held not error.**

Where conspiracy involved 310 illegal transactions, instruction that, even if jury disbelieved testimony of witness whose testimony related to 20 transactions only, there was sufficient evidence, if believed, to find verdict of guilty, *held* not error, since main defense consisted in attacking such witness, and not in controverting government's case.

In Error to the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

The A. Guckenheimer & Bros. Company and others were convicted under Criminal Code, § 37, of conspiring to obtain the release of whiskey from bond and to sell and deliver it unlawfully, and they bring error. Affirmed.

Charles B. Prichard, B. B. McGinnis, and Oliver K. Eaton, all of Pittsburgh, Pa. (Frank Davis, Jr., of Washington, D. C., of counsel), for plaintiffs in error A. Guckenheimer & Bros. Co., Brown, and Farkas.

John M. Henry and Jos. H. Reich, both of Pittsburgh, Pa., for plaintiffs in error Little and Beck.

Louis Little, of Pittsburgh, Pa., for plaintiff in error Dickerman.

Walter Lyon, U. S. Atty., and George V. Moore and Arthur W. Henderson, Sp. Asst. U. S. Attys., all of Pittsburgh, Pa.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This case was prosecuted against a corporation and 13 persons under an indictment which charged them with conspiring to obtain the release of a large quantity of whiskey from bond and to sell and deliver it unlawfully. Section 37 of the Criminal Code (Comp. St. § 10201).

The trial court directed the acquittal of Frank Tito; the United States attorney entered a nolle prosequi as to Sherer; the jury acquitted Shapiro, Mazer, Weiners and Morrison and rendered a verdict of guilty against A. Guckenheimer & Brothers Company, a corporation, and against Brown, Farkas, Joseph Tito, Little, Beck, Dicker-

man and Ferris. To the sentences imposed the convicted defendants, except Joseph Tito, sued out these writs of error.

In order to discuss the principal matters presented by the many assignments of error, it becomes necessary to state the case. However, in view of the great volume of testimony and the intricacies of the facts, involving the Federal liquor permit system, we shall give the story only in outline.

A. Guckenheimer & Brothers Company owned one of the oldest whiskey distilleries in Western Pennsylvania, located at Freeport. It owned another with which the case has little to do. In 1921, Farkas, Shapiro, Mazer and Brown purchased the entire capital stock of the corporation. In the reorganization which followed, Farkas became President; Shapiro, Vice President; Mazer, Treasurer; and Brown, a Director.

This deal carried with it the ownership of approximately 5,000 cases of whiskey which were tax paid and in the free warehouse of the distillery. There were, at the time, between 9,000 and 10,000 barrels of whiskey, or about 400,000 gallons, in the bonded warehouses of the corporation against which warehouse receipts, or "certificates," had been issued. These certificates evidenced the ownership of the liquor and could be lawfully bought and sold. They were held by many persons then in no way connected with the transaction. So far everything was lawful. The problem to one who, in such a situation, contemplates making money by illicit traffic in whiskey which is on his premises yet is owned by others lies first in acquiring ownership of the whiskey and next in getting it out of bond and into the hands of bootleggers. This involves the difficulty of getting it past Government agents in charge of the bonded warehouse and procuring its delivery, which can lawfully be done only on permits to purchase issued by the Government to those who have qualified to buy liquor for lawful use. How these difficulties were overcome in the instant case may be illustrated by one transaction.

Deitrick, formerly a wholesale liquor dealer at McKeesport, Pennsylvania, held certificates showing that he owned thirty-five barrels of Guckenheimer whiskey in the bonded warehouses of the corporation. Being in bond, this whiskey was not available for illicit sale and was therefore worth relatively little money. Being of small value compared with its value if it were in his possession, Deitrick sold his certificates to J. A. Farkas, a brother of one of the de-

fendants, for about $4,100. At the same time he purchased from Farkas 150 cases of Guckenheimer whiskey at about $90 a case, to be delivered at his place of business. Later, he made other purchases, amounting to 350 cases in all. The immense profits of such a transaction, when carried through, represent the difference between the value of whiskey in bond and its value out of bond; or the difference between whiskey certificates lawfully held and actual whiskey unlawfully possessed. For instance, a barrel of whiskey will make approximately 15 cases. Deitrick was paid $4,100 for certificates for 35 barrels, enough to make 525 cases. In return, he purchased 350 cases for $34,000; that is, he sold his whiskey for $4,100 and in effect re-purchased a portion of his own whiskey for $34,000.

It was therefore obvious that before such profits could be realized the whiskey in the bonded warehouses of the corporation had to be delivered to purchasers, who, as in Deitrick's case, not holding permits to purchase, had no right to receive it. The only way to make such deliveries was by violating the law. Certain of the defendants proceeded to do this in the following manner: First, they lawfully acquired lawful certificates, thus obtaining lawful title to the whiskey which upon its release gave them the right to pay the government tax. They then procured forged permits, not in the names of the actual purchasers, whose identity for obvious reasons had to be concealed, but in the names of other persons, real or fictitious. On these the first step in the release of the whiskey was effected. Here another difficulty was encountered, and this had to do with the physical delivery of whiskey to the undisclosed purchasers—persons other than the persons named in the forged permits. This involved complicity of truckmen in the unlawful transaction. So, in 1921, such deliveries were made by the "Interstate Trucking Company" of which Little was proprietor and Beck manager. In 1922 deliveries were made by Joseph Tito, a trucker, and in two instances by "Breet Trucking Company," a fictitious concern. There was still another difficulty to be surmounted in delivering whiskey to purchasers for illicit use. This grew out of a practice of the department requiring that before whiskey can be released and delivery made on valid permits the Government storekeepers and gaugers must have the permits confirmed by the Federal Prohibition Director's Office. False confirmations were procured through counterfeit post office records;

through impersonation of Government officers; and through corruption of Federal employees. Confirmation can also be lawfully made by telephone. In one instance, a storekeeper at the Freeport bonded warehouse, when proceeding to obtain confirmation of what was a bogus permit, was directed by one involved in the conspiracy to call up the office of the Federal Prohibition Director at Philadelphia by one of two telephone numbers given him. On making the call the permit was confirmed by the party at the other end of the line. But the numbers given the storekeeper were those of the Hotel Walton and not of the Office of the Federal Prohibition Director and, of course, the confirmation was made by one without authority.

In order to make deliveries of this very large quantity of whiskey it was found necessary to have caches where liquor could be stored after its removal from the distillery, and also necessary, in addition to truckers, to employ individuals to effect distribution to a large body of ultimate purchasers. One of such places was maintained by Dickerman, who had in the cellar of his garage a secret room in which the whiskey was stored and from which, through a small hole, it was passed on being loaded upon outbound tracks for transportation. One of these trucks conveying Guckenheimer whiskey was stopped by Government officers and the driver on being arrested disclosed the situation.

Ferris, a Federal Prohibition Agent, was engaged in making small deliveries.

The transactions, of which we have given an example, involved 310 forged permits, made in some instances in the names of fictitious persons but more generally in the names of entirely reputable druggists, business houses, and individuals without their knowledge, to no one of whom were deliveries made. Through these permits approximately 100,000 gallons of whiskey were released and delivered to unknown persons for unlawful use. For lawful use, as for medicine, the whiskey thus delivered would have been worth about $1,000,000, but when diverted to unlawful use it was worth several times as much.

[1,2] At the trial the 310 permits were offered in evidence and the signature on each was proven a forgery. Much of the evidence offered by the Government on the issue of forged permits consisted of letters confirming permits, envelopes, return registry receipts or post cards, telegrams, telephone records, memoranda and correspond-

ence obtained from the corporation in a manner which all the defendants maintained at the trial, and now urge here, was violative of their rights under the Fourth Amendment to the Constitution.

The alleged unlawful search and seizure occurred in a transaction long before the indictment in this case was found. The corporation had been doing business as a wholesale liquor dealer under a Government license permitted by law. In an investigation of the corporation's conduct under the license which the Government was making, certain prohibition officers demanded and received the papers in question. They were in their hands when the indictment was found and, being retained, were offered and admitted as evidence at the trial. Their admissibility as evidence has two aspects; one as it bears on the individual defendants, and the other as it bears on the corporate defendant. It has two more; one having to do with the facts of the alleged seizure, and the other with the effort made to prevent the use of the papers as evidence.

It should first be noted that all the papers referred to belonged to the corporate defendant. This being true, the corporation, after the case had been listed for trial, petitioned the court for their return. No claim of property was ever made by or on behalf of any other defendant. After the trial had begun, the Government, knowing of the pendency of the petition, moved the court to take it up and decide it as a preliminary matter. This was opposed by the defendants. Still another opportunity to dispose of the petition was offered by the Government after the testimony of the second witness had been given. This likewise was declined by the defendants. The matter was not brought to the court for decision until after evidence in relation to some of the papers had been introduced into the record. The court then excused the jury and took testimony to determine the legality of the Government's possession of the papers and accordingly their admissibility as evidence. On these facts the Government maintained that the defendants had waived whatever rights they had in relation to their possession. The court passed by this question and, going to the heart of the matter, found as a fact that the papers had been voluntarily surrendered by the corporation to the Government and held that, as there was no illegality connected with their possession, the Government could validly use them for evidence. In reviewing this decision our first holding is that the Government's ac-

tion in gaining possession of papers belonging to the corporation did not relate to nor did it affect the personal defendants. If these papers were unlawfully seized and thereby the constitutional rights of any one were invaded, they were the rights of the corporation and not the rights of the other defendants. Next, it is clear that a question of the lawfulness of a seizure can be raised only by one whose rights have been invaded. Certainly such a seizure, if unlawful, could not affect the constitutional rights of defendants whose property had not been seized or the privacy of whose homes had not been disturbed; nor could they claim for themselves the benefits of the Fourth Amendment when its violation, if any, was with reference to the rights of another. Remus v. United States (C. C. A.) 291 F. 501, 510, 511. It follows therefore that the question of the admissibility of the evidence based on an alleged unlawful search and seizure does not extend to the personal defendants but embraces only the corporation whose property was taken. Coming to this last aspect of the question, we find that a demand for the papers was lawfully made by prohibition officers and that, within the principle of Wilson v. United States, 221 U. S. 361, 31 S. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558, the corporation was bound to surrender them. While the corporation resisted the Government's demand and violent disputes followed, it did, nevertheless, give up the papers. We do not regard their surrender as having been made under duress, as now claimed by the corporation, but under a necessity imposed by law. While reluctantly made, the surrender was in a legal sense voluntary. The evidence is sufficient to support this finding of fact by the trial court. Having voluntarily surrendered the papers for one purpose, their use at the trial of this case for another purpose was not the result of a search or a seizure and was therefore not in violation of the corporation's rights under the Fourth Amendment. We are of opinion they were properly admitted in evidence.

[3] The next contention to which we shall address discussion relates to the refusal of the trial court to charge the defendants' fifteenth prayer, whose concluding paragraph reads as follows:

"If the jury believe that any defendant did not know that a delivery or deliveries of whiskey were to be made upon such forged, false and fictitious permit, such belief would warrant the jury in finding such defendant not guilty."

On first view it would seem that the defendants might have been entitled to this instruction and that the court might have erred in its answer—"Covered by general charge." What was the general charge? The general charge followed the indictment and dealt with a conspiracy by the defendants to obtain from bond, sell, transport, and deliver liquor on forged, false and fictitious permits. The indictment charged the defendants with conspiring to do this thing in a way described with much particularity; and, as we read the evidence, it was wholly impossible for the defendants to have done the thing in this way and believe that the permits through which it was done were lawful or were lawfully used. As the jury found that the defendants conspired to do the thing in this manner, it follows necessarily that the jury found that they knowingly conspired to do it, that is, they conspired to do it through permits which they knew were forged. The defendants complain that in this and other respects the court in its charge did not outline adequately and fairly the theory of the defense. We are of opinion that the court covered every defense available to the defendants. In fact, it was very careful to give them all the protection the law affords, notably in respect to instructions on reasonable doubt, that subject appearing twenty-two times in the charge.

[4] A number of the defendants, of which Dickerman was one, attacked the indictment by a motion in arrest of judgment, Kellerman v. United States (C. C. A.) 295 F. 796, on the ground that it did not charge them with conspiracy. This question arose from the expression of the indictment that "A. Guckenheimer & Brothers Company, Lewis Brown, Louis Farkas, Benjamin S. Shapiro and Joseph Mazer, * * * unlawfully and feloniously did conspire, combine, confederate and agree *together, with* Joseph Tito, Frank Tito, Edward C. Little, George Beck, William Dickerman, Jack Weiners, Michael Morrison, Joseph Sherer and William J. Ferris * * * to commit divers * * * offenses against the United States." The contention is that the indictment charged conspiracy only against the first group of defendants, the ones who did "conspire * * * and agree together," and that the second group, joined to the first by the word "with," were named only to describe the real offenders. We are unable to find in this play on words an exclusion of the latter group. On the contrary, the grand jury meant what it said,

namely, that the persons in one group agreed with those in the other group and that all conspired to commit the forbidden offenses. Coming to the trial, the evidence amply sustained the conviction of those who in the second group were found guilty.

[5, 6] As to Ferris the evidence shows that he was a part of the complicated machinery of the conspiracy which in its operation disposed of large quantities of liquor unlawfully released from bond. Regarding the distillery as the center of the mechanism, its parts extended in many directions and it was only at their extremities that the whiskey was ultimately delivered and profits made. Such was Ferris' place.

Ferris was a prohibition agent. In June, 1922, two automobiles containing Guckenheimer whiskey were arrested while leaving the Fort Pitt Hotel in Pittsburgh. From the drivers and from the night manager of the hotel it was learned that Ferris had arranged for the delivery of five cases of whiskey to the hotel and that he had told the night manager how the whiskey should be disposed of. Two of the cases, in the original packages with serial numbers intact, had been delivered at Ferris' request to the treasurer of the hotel, and were afterwards recovered by Federal officers. This whiskey was delivered to the Fort Pitt Hotel on June 22 and on the following day Ferris made a partial confession to his superior officers. From the serial numbers on the cases it was possible to see that they were withdrawn from the distillery on a permit (Exhibit 77) which called for 250 cases, two days before they were seized. It also appears that Ferris knew the day before it was released that the whiskey was coming out. In order that the jury might convict Ferris of conspiracy it was not necessary that the Government should prove that he knew and participated in every action of every other member of the conspiracy. It was enough if the evidence showed that he agreed to play a part, though as in this instance a relatively minor part. We think the evidence was sufficient.

[7] It is insistently urged by all defendants that grave error was committed by the court in a supplemental charge addressed to the jury in response to an inquiry made when they returned for further instructions. A juror said:

"It seems to be the opinion of some of the jurors that there is not enough evidence to convict without Stone's evidence. How is that?"

The court replied:

"In that particular, gentlemen of the jury, we say to you that, in the opinion of the court, there is sufficient evidence in the case, independently of the testimony of Stone, to render a verdict of guilty in this case, if the testimony is believed by the jury; and we say this to you gentlemen, with the same qualification that we made when we delivered our general charge, that you are the absolute judges of the facts and that the court may express an opinion, but that opinion is not binding upon you and is a mere expression of opinion, with the understanding, of course, that you are the sole and absolute judges of the facts. But in our opinion the evidence in the case is sufficient, if believed, to justify a verdict of guilty independent of the testimony of Stone."

The defendants take the position that the words of the court were in effect a direction of a verdict of guilty in that they took from the consideration of the jury an element in the case which, had it remained, might and probably would, in view of the juror's inquiry, have raised a reasonable doubt of guilt. To one who has not read the record there would seem to be substance in this contention. The record discloses, however, that the main defense consisted not in controverting the Government's evidence—none of the defendants took the stand—but in attacking the witness Stone whose evidence for the prosecution was more or less vulnerable. If the case concerned only one transaction and if Stone's evidence had been directed to it, an instruction that his evidence might be disregarded would take from the case a ground on which a reasonable doubt might be built and would therefore be clearly erroneous. But the record discloses that the transactions involved in this conspiracy were not one or several but were 310 in number and that Stone's testimony related to only twenty of them, leaving nearly three hundred in respect to which, as the court said, there was "sufficient evidence in the case, independently of the testimony of Stone, to render a verdict of guilty." As the greater number of transactions were not affected by Stone's testimony it is clear the court merely stated a fact and therefore committed no error in instructing the jury that with reference to the rest there was sufficient evidence, if believed, on which to find a verdict of guilty. We discover no error in this instruction.

Many of the assignments of error are directed to the court's rulings on the evidence. We have given full and serious consideration to all and have found error in none. We shall not unduly extend this opinion by discussing the grounds which have led us to our conclusions.

The judgments below are affirmed.