**MELLO et al. v. UNITED STATES.**

No. 5038.

Circuit Court of Appeals, Third Circuit.

June 19, 1933.

Harry H. Weinberger and Minturn & Weinberger, all of Newark, N. J., for appellants.

Harlan Besson, U. S. Atty., and Walter B. Petry, Asst. U. S. Atty., both of Trenton, N. J.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

THOMPSON, Circuit Judge.

This is an appeal from the District Court for the District of New Jersey. The jury returned verdicts of guilty on the first, fourth, and fifth counts of the indictment. The court, on motions in arrest of judgment, dismissed the fifth count and imposed sentence upon each defendant on the first and fourth counts. The first count charged the defendants with manufacturing intoxicating liquor in violation of the National Prohibition Act, tit. 2, § 3 (27 USCA § 12). The fourth count charged them with making and fermenting mash fit for and intended for distillation in violation of the internal revenue laws (26 USCA § 307).

■ The defendants urge that, under the provisions of the Willis-Campbell Act, § 5 (27 USCA § 3), a conviction on either count precludes a conviction upon the other. That act provides: "All laws in regard to the manufacture and taxation of and traffic in intoxicating liquor, and all penalties for violations of such laws that were in force on October 28, 1919, shall be and continue in force, as to both beverage and non-beverage liquor, except such provisions of such laws as are directly in conflict with any provision of this title; but if any act is a violation of any of such laws and also of this title, a conviction for such act or offense under one shall be a bar to prosecution therefor under the other."

Two separate and distinct offenses were charged in the counts under review: The manufacture of intoxicating liquor in violation of the National Prohibition Act, and the making and fermenting of mash in violation of the internal revenue laws. The two offenses are not one and the same, nor are they in conflict with each other. Convictions on both counts are therefore not in violation of the provisions of the Willis-Campbell Act.

■ The next contention is that the evidence relied upon by the government to sustain the convictions was obtained by means of an unlawful search. The prosecution was based upon testimony of prohibition agents and investigators that they detected the odor of fermenting mash emanating from the premises in which the defendants were later arrested, and that they heard the sound of machinery and the hiss of steam. They thereupon entered the premises without a search warrant and found a still in operation, 2,000 gallons of alcohol, and 45,000 gallons of mash in the process of fermentation.

The defendants assign as error the refusal of the trial court to suppress the introduction of any evidence discovered during the raid. They contend that the search and seizure were illegal because made without a search warrant. We do not deem it necessary to determine whether the search and seizure, made under the circumstances which existed in the instant case, would have been legal if any one shown to be an owner or tenant of the premises searched had raised the question. It was part of the defendants' case that they were employees and not owners or tenants of the premises entered and searched. They, therefore, are not in a position to avail themselves of the protection afforded by the Fourth Amendment to the Constitution.

It has been consistently held in the va-

rious circuits that the guaranty of the Fourth Amendment against unreasonable search and seizure is a personal right or privilege, available only to one who claims ownership or possession of the property which has been subjected to the alleged unreasonable search or seizure. This court so held in Chepo v. United States, 46 F.(2d) 70. The question was determined in the same way by the Second Circuit in Connolly v. Medalie, 58 F.(2d) 629; by the Fifth Circuit in Cantrell v. United States, 15 F.(2d) 953, certiorari denied 273 U. S. 768, 47 S. Ct. 572, 71 L. Ed. 882; by the Sixth Circuit in Remus v. United States, 291 F. 501; by the Eighth Circuit in O'Fallon v. United States, 15 F.(2d) 740, certiorari denied 274 U. S. 743, 47 S. Ct. 587, 71 L. Ed. 1321; and by the Ninth Circuit in Bilodeau v. United States, 14 F.(2d) 582, certiorari denied 273 U. S. 737, 47 S. Ct. 245, 71 L. Ed. 866.

Since no constitutional right of the defendants has been invaded, they are not in a position to attack the legality of the search and seizure. With this question disposed of adversely to the contention of the defendants, the record discloses that there was ample evidence to justify the jury in returning the verdicts of guilty.

Some emphasis is placed by the defendants upon an alleged illegal exploratory search of their clothing made by prohibition agents. The authorities submitted, however, are inapplicable in view of the fact that the testimony upon which the defendants rely does not sustain their contention that the prohibition agents searched their clothing.

We find no substantial error in the charge of the court.

The judgments are affirmed.

BUFFINGTON, Circuit Judge (concurring).

Agreeing, as I do, with the foregoing, I deem it proper to add that, assuming the defendants could raise the question of the legality of the search, I think the court committed no error in holding it was legally justified. The proofs of law violation by Mello and his associates were clear. On entry into the premises a 10,000 gallon still was being operated by the defendants. They all made admission of their guilt. The evidence was:

"The men all had on working clothes, all stained with mash, and they were stripped from their waist up. It was terribly hot in this place and they just wore a pair of trousers. The clothes were dirty with soot and mash and we turned all the steam off, pulled the fire in the boilers and stopped the steam from going through the columns, keeping the men under guard in the meantime. And we questioned the men as to the length of the time they worked there and they all admitted that they worked there and operated the still, but they would not tell us who hired them or paid them. They said they received amounts from $39 to $49 a week in cash by some man meeting them on the corner and paying them, but they did not know who owned the still or anything. * * *

"There was in process of fermentation two 20,000 gallon vats full of fermenting mash. Another 20,000 gallon vat about one-quarter; approximately from 45,000 to 50,000 gallons of molasses mash in the process of fermentation. Another tank of about 10,000 gallon capacity was probably from one-fourth to one-half full of molasses, that is ordinary black strap cane molasses which was used in the mash. In the floor was a tank, and embedded in the floor was another which probably would hold 5,000 gallons, practically full. The plant was powered by two upright boilers of about 75 horsepower, each under high steam pressure at the time we entered and the steam was going full capacity when we entered. The hose line led from this garage, where I mentioned that we forced the door in, to a separate room. There were tracks where the truck had been backed in there and a hose line laid from there to the molasses vat. Before the men were taken to the police station they had all changed their clothes. They had their clothes hanging on hooks on the wooden partition that separated the still room from this garage."

And the convictions were proper unless the court erred in refusing to suppress the evidence on the ground of the illegality of the entrance of the officers without a search warrant.

The facts in the case are these: The prohibition agent testified that on approaching the brewery he "could distinctly hear the machinery running very plainly and the hissing of steam from the boilers, but I could not hear the talking because of that noise. * * * I did not hear anybody, but I heard the machinery running and the hissing of steam, and I took it for granted someone was there attending to the machinery."

Another agent testified: "While approaching this building I detected a very distinct and strong odor of fermenting molasses mash, and during my investigation with Investigator Chalfant we circumnavigated this building and approached it from every

possible angle, and in a public alleyway leading off of Main Avenue, we approached what was a rear door to these premises and there I heard the distinct noise of machinery running and the hissing of steam, and again obtained a distinct odor of fermenting mash combined with alcohol—that is a similar odor. As a result of this, under instructions from Investigator Chalfant, after a wait for Newark men to come to reinforce us, I forced the door on the McLean Street side of the building."

It is thus quite evident that we have before us a case not of dead or bottled liquor but of grain or mash being cooked and spreading abroad such fumes as led to a just suspicion that the law was being violated. The smell was of fermenting mash, and fermenting mash necessarily conveys the idea of very recent, or even present, cooking operations. It is quite evident that the odor emanating from the cooking of grain or cereals is an altogether different thing from the dead smell of an uncooked article or of such articles cooked and standing cold. To use a homely illustration. If sauerkraut or cabbage is cooked in a kitchen, the smell permeates the whole house, while the same cabbage or sauerkraut, either before cooking or after it is cooked and cooled, standing on a kitchen table, sends no odor through the dwelling. Why is this so? The reason is obvious. When odor-producing articles are being cooked, the rising steam and hot air disseminate the smell on all sides. Cooking is an agitator of air.

With all these facts before him, was the officer to betake himself to a United States Commissioner to get a search warrant to enter premises on which he had physical proof by his own senses that the law was being violated? The prohibition officer summed the whole thing up in his answer to the question, "Why didn't you go get a search warrant if you knew so surely? A. I didn't figure I needed a search warrant. If I had the evidence to get a search warrant, I had the evidence to seize it without." It seems to me this sums up the situation. On the exterior of the door of the premises was the evidence of the operations within. If this evidence was created by those who were heard moving around inside and as a result of their operations the evidence was conveyed out of the building in the shape of noise and odors, that afforded evidence of a just suspicion which they themselves had created. To throw a shield over these men who had themselves made the interior of their building a place of suspicion, and to envelop them in the

panoply of constitutional protection when they themselves furnished evidence on the outside of the building entered that they were breaking the law within, is a misapplication of a provision that was embodied in the Constitution to insure the privacy of a man's person and dwelling from illegal inquiry. The acts of those within the building caused and created a just suspicion in the minds of those outside the building. See Pong Ying v. United States (C. C. A.) 66 F.(2d) 67.