**BOWLES, Adm'r, Office of Price Administration, v. BEATRICE CREAMERY CO. SAME v. VOERDING.**

Nos. 3040, 3041.

Circuit Court of Appeals, Tenth Circuit.

Dec. 29, 1944.

David London, Chief, Appellate Branch, Office of Price Administration, of Washington, D. C. (Thomas I. Emerson, Deputy Adm'r for Enforcement, Fleming James, Jr., Director, Litigation Division, and Harold Craske, Atty., all of Washington, D. C., Max D. Melville, Regional Litigation Atty., of Denver, Colo., and James W. Brown, District Enforcement Atty., Office of Price Administration, of Cheyenne, Wyo., on the brief), for appellant.

Albert D. Walton, of Cheyenne, Wyo., for Beatrice Creamery Co.

Albert D. Walton, of Cheyenne, Wyo. (L. E. Armstrong, of Rawlins, Wyo., and Norman B. Gray and C. R. Ellery, both of Cheyenne, Wyo., on the brief), for N. F. Voerding.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

These actions were brought by Chester Bowles, as Administrator of the Office of Price Administration.[1] In No. 3040 he sought to recover damages under § 205(e) of the Emergency Price Control Act of 1942,[2] 50 U.S.C.A.Appendix, § 925(e), against the Beatrice Creamery Company[3] for alleged violations of Revised Maximum Price Regulation No. 269, as amended,[4] establishing maximum prices for wholesale poultry items. In No. 3041 he sought to recover damages under § 205(e) against N. F. Voerding for alleged violations of General Maximum Price Regulation, as amended,[5] establishing maximum prices for commodities and services respecting the sale of ice cream.

In each case the defendant therein filed a motion to suppress certain evidence. The trial court sustained the motions to suppress. The Administrator, through his counsel, then advised the trial court that he had no additional evidence to present. Whereupon, the actions were dismissed. The Administrator has appealed in each case.

In support of its motion to suppress, Beatrice filed the affidavit of Harold F. Fairley in which he averred that he was the manager of the Wyoming and Northwestern Nebraska territory of Beatrice; that as such he had supervision and management of the plant and office of Beatrice at Cheyenne, Wyoming, and its warehouses and sales offices at Casper, Wyoming, and Scottsbluff, Nebraska; that the sales records and books for such territory were kept in the Cheyenne office; that on May 8, 1943, Andrew Royce and Jack Lawson, investigators for the OPA, came to the Beatrice office at Cheyenne, Wyoming; that Royce told Fairley they were investigators for the OPA and showed him his written credentials; that Royce, in his of-

ficial capacity, demanded that Fairley show him the sales tickets for all merchandise sold by Beatrice from December, 1942, to date; that believing that Royce could legally demand inspection of such sales tickets and believing he was compelled to show them to Royce, he unwillingly and through official pressure, showed such tickets to Royce and Lawson and permitted them to inspect and examine such tickets; that he would not have exhibited the "sales tickets for poultry sold by Beatrice" had it not been for the fact that Royce introduced himself as an investigator for the OPA and showed him his written identifications as such "and in his official capacity, demanded the right to inspect the sales tickets for poultry sold."

At the hearing on the motion to suppress, Fairley testified that Royce and Lawson came in, introduced themselves, showed him their cards of identification, "and said they wanted to check my sales and record books. I hesitated about it but they had their credentials giving them authority to look at our records and copy them or whatever they wanted to do with them. * * * After that I went ahead and let them, the office gave them the records and they made copies of them."

In response to the motion to suppress, the Administrator filed the affidavits of Royce and Lawson. In his affidavit, Royce averred that he and Lawson went to the office of Beatrice on the morning of June 2, 1943, and contacted Fairley, the manager; that he told Fairley he and Lawson were investigators for the OPA; that he and Lawson showed Fairley their identification cards; that he requested Fairley to permit them to examine and copy the books, records, and other documents of Beatrice relating to poultry sales, and particularly to sales and purchases of quick-frozen and eviscerated poultry items during the period from December 18, 1942, to June 2, 1943; that Fairley made no objection to such request, said he would let them work in the office as long as they wanted to, called in one Lengel, introduced Lengel to them, and instructed Lengel to let them see the records; that thereupon he and Lawson inspected several files containing sales slips, and that Fairley and employees of Beatrice cooperated with and aided them in such examination. The affidavit of Law-

---

[1] Hereinafter referred to as OPA.
[2] Hereinafter referred to as the Act.
[3] Hereinafter referred to as Beatrice.
[4] 7 Fed. Register 10706.
[5] 7 Fed. Register 3153.

son was substantially to the same effect as the affidavit of Royce.

In support of the motion to suppress in No. 3041, Voerding filed an affidavit in which he averred that on a number of occasions during the summer and fall of 1943, certain persons, who informed him that they were duly authorized agents of the OPA, visited him at his place of business in Rawlins, Wyoming; that such persons demanded that he make available to them his books, records, files, and papers kept by him in connection with the operation of his creamery business and as a dealer in ice cream and dairy products so that they might inspect such books, records, files, and papers; that he protested and objected; that thereupon such agents stated they had authority under the Act and regulations and orders of the Administrator to make such inspection and that he was bound and required by law to make available to them such books, records, files, and papers; that such investigators thereby overcame his protest and objection and caused him to produce and make available to them his books, records, files, and papers, and such agents inspected them; that such agents "particularly demanded the production of affiant's books, records, files and papers pertaining to purchases of ice cream made from him from [by] various and divers persons and said agents obtained from his books, records, files and papers the names of said purchasers and the quantity or quantities of ice cream purchased and the price charged by affiant therefor."

In response to the motion to suppress in No. 3041, the Administrator filed the affidavits of Jack L. Ankney and Stanley Blackburn, Jr. In his affidavit, Ankney averred that on December 29, 1942, pursuant to instructions, he called at Voerding's place of business in Rawlins, Wyoming, identified himself as an investigator for the OPA and asked Voerding for his "base period records, meaning his sales tickets and invoices showing sales during the month of March, 1942, and also for his records of sales to various and divers establishments located in Rawlins, Saratoga, and Parco, Wyoming"; that to such request Voerding replied that "all of his records were there," meaning his office, and "that affiant was free to look at them"; that he then and there inspected the statement filed with the Local War Price and Rationing Board setting forth the prices charged by Voerding for various quantities of ice cream during

the month of March, 1942, and also inspected and examined sales slips relating to sales of ice cream by Voerding; that Voerding further stated that as far as he was concerned any records which he had in his office "which were connected with the Office of Price Administration were an open book and that affiant was free to look at them at any time."

In his affidavit, Blackburn averred that on April 29, 1943, he went to Voerding's office in Rawlins, Wyoming, introduced himself to Voerding as an investigator for the OPA, presented his identification card to Voerding, and requested Voerding to allow him to examine sales tickets, invoices, and other documents relating to the sale of ice cream for and during the month of March, 1942; that Voerding inquired of him by what right he was authorized to make such inspection; that he replied that his authority was pursuant to the provisions of the Act; that thereupon he accompanied Voerding to the office of an attorney by the name of Armstrong; that some general discussion was had by him, Armstrong, and Voerding regarding his right to examine and inspect such records; that thereupon he went to the waiting room in the office of Armstrong and further discussion was had between Armstrong and Voerding in the former's private office; that Voerding then came out of the private office and gave him permission to examine and inspect such records; that he returned to Voerding's office where certain invoices and sales tickets were furnished him by Voerding for his examination and inspection; that he interviewed Voerding on several occasions thereafter and at no time was he refused the right to inspect sales tickets, invoices, books, and records of Voerding.

Other than by the general averments in his affidavit, Voerding did not challenge the averment of Blackburn's affidavit that Voerding consented after consulting with his counsel.

The trial court made no formal findings, but, in a memorandum opinion filed in the cases, he stated, in effect, that the demand and examination were too broad and embraced books, records, and papers, without showing their relevancy, and amounted to a fishing expedition, and that the consent given by Fairley and Voerding was in the nature of a peaceful submission to the officers of the law and was not a consent amounting to a waiver of their constitutional rights.

Section 202(b) of the Act, 50 U.S.C.A. Appendix, § 922(b), authorizes the Administrator, by regulation or order, to require any person engaged in the business of dealing with any commodity to make and keep records and other documents and to permit the inspection and copying of records and other documents and the inspection of inventories, and, whenever necessary, by subpoena to require any such person to appear and testify or to appear and produce documents, or both, at any designated place.

Section 1429.4 of Revised Maximum Price Regulation No. 269[6] provides that every seller and purchaser subject to such regulation making sales or deliveries or purchases of poultry items to the value of $200.00 or more in any one month, after December 21, 1942, shall keep for inspection by the OPA so long as the Act remains in effect a complete and accurate record of each sale or delivery of poultry items, showing the date of purchase or sale, the name and address of the buyer and seller, the quantities, types, grades, weight classes of poultry bought and sold, the type of sale made (delivered or non-delivered), and the price paid or received.

Section 1499.11 of General Maximum Price Regulation provides that every person selling commodities or services for which, upon sale by that person, maximum prices are established by such regulation, shall preserve for examination by the OPA all his existing records relating to the prices which he charged for such commodities or services as he delivered or supplied during March, 1942, and his offering prices for delivery or supply of such commodities or services during such month; and shall prepare, on or before July 1, 1942, a statement showing the prices which he charged for such commodities or services during March, 1942, and his offering prices for delivery or supply of commodities or services during such month, and all his customary allowances, discounts, and other price differentials.

Section 1499.12 of General Maximum Price Regulation provides that every person selling commodities or services for which maximum prices are established by such regulation shall keep, and make available for examination by the OPA, records of the same kind as he has customarily kept relating to the prices which he charged for such commodities or services sold after the effective date of such regulation, and, in addition, records showing the basis upon which he determined maximum prices for such commodities or services.

Section 1499.20(m) of General Maximum Price Regulation defines "records" as follows:

"'Records' includes books of account, sales lists, sales slips, orders, vouchers, contracts, receipts, invoices, bills of lading, and other papers and documents."

Section 205(f)(1) of the Act provides that whenever, in the judgment of the Administrator, such action is necessary and proper, in order to effectuate the purposes of the Act and to assure compliance with and provide for the effective enforcement of any regulation or order issued under § 2 of the Act, or any price schedule effective in accordance with § 206 of the Act, he may, by regulation or order, issue to or require of any person or persons subject to any regulation or order issued under § 2, or subject to any such price schedule, a license as a condition of selling any commodity or commodities with respect to which such regulation, order, or price schedule is applicable, and that it shall not be necessary for the Administrator to issue a separate license for each commodity or for each regulation, order, or price schedule with respect to which a license is required.

Section 16(a) of General Maximum Price Regulation provides that a license as a condition of selling is required of every person selling at wholesale or retail any commodity or service for which a maximum price is established by such regulation, or by any other price regulation.

Section 16(b) of General Maximum Price Regulation provides that every person selling at wholesale or retail any commodity or service for which a maximum price is established by such regulation, or by any other price regulation, is, by the General Maximum Price Regulation, granted a license as a condition of selling any such commodity or service; that the provisions of General Maximum Price Regulation and of every price regulation shall be deemed to be incorporated in the license so granted; that such license shall be effective on the effective date of General Maximum Price Regulation, or when any such person becomes subject to the maximum price provisions of such regulation, or any other

price regulation, and shall, unless suspended, remain in effect as long as such regulation, or any applicable part, amendment, or supplement remains in effect.

Counsel for the Administrator assert that the records which the investigators sought to inspect and examine, and which they, in fact, inspected and examined, were records required to be kept by the regulations, and that the investigators were lawfully entitled to inspect- and examine such records, to demand the right to inspect such records, and to compel assent to such demand by anything short of physical force.

They further assert that Beatrice and Voerding were doing business under licenses granted by the Administrator under the provisions of the Act, and that as licensees they were under the legal duty to permit the inspection and copying of the records in question when required so to do by the Administrator or his duly authorized representatives. The latter contention finds support in United States v. Mulligan, D. C.N.Y., 268 F. 893, a case arising under the Lever Act, 40 Stat. 276, and A. Guckenheimer & Bros. Co. v. United States, 3 Cir., 3 F.2d 786, involving a wholesale liquor licensee.[7]

On the other hand, counsel for Beatrice and Voerding contend that inspection can only be compelled by lawful process and that consent of the owner is necessary to lawful inspection at his place of business. They predicate their contention upon Cudahy Packing Co. v. Holland, 315 U.S. 357, 364, 788, 62 S.Ct. 651, 655, 86 L.Ed. 895, wherein the Supreme Court said:

"The subpoena power differs materially in these respects from the power to gather data and make investigations which is expressly made delegable by § 11. Without the subpoena that power is in effect a power of inspection at the employer's place of business to be exercised only on his consent."

As a means of enforcing a valid law, Congress may require the keeping of records reasonably necessary to that end. To require the keeping of records showing whether there has been compliance with a valid law is an appropriate means to a legitimate end.[8] Such records are quasi-public in character and as to them the privilege against self-incrimination under the Fifth Amendment does not apply.[9]

There are cogent reasons why production and inspection should only be compelled by lawful process. Where the production is in response to lawful process, the owner of the books and papers is afforded protection by the limitations which the law imposes with respect to lawful process. Such process must state the subject of the inquiry, must particularly describe the books and papers so that they can be readily identified, and must limit its requirements to books and papers that are relevant to the inquiry. In other words, such process must confine its requirements within the limits which reason imposes in the circumstances of the particular case.[10] Moreover, the person to whom such process is addressed may challenge its legality before being compelled to respond thereto.

Whether the doctrine of the license cases with respect to the right of inspection at the owner's place of business, without his consent, should be applied under the provisions of the Act and the applicable regulations may be subject to doubt. No written license is issued and delivered to the licensee. The license is automatic and by force of the regulation. There was no application for a license by Beatrice and Voerding, and they did not accept a license, unless acceptance may be implied

[7] See, also, State v. Donovan, 10 N.D. 203, 86 N.W. 709, 710, 711; State v. Davis, 68 W.Va. 142, 69 S.E. 639, 640-642, 32 L.R.A.,N.S., 501, Ann.Cas.1912A, 996; State v. Legora, 162 Tenn. 122, 34 S.W.2d 1056, 1057, 1058; People v. Rosenheimer, 209 N.Y. 115, 102 N.E. 530, 531, 46 L.R.A.,N.S., 977, Ann.Cas. 1915A, 161; State v. Hall. 164 Tenn. 548, 51 S.W.2d 851, 852, 853; State v. Stein, 215 Minn. 308, 9 N.W.2d 763, 765.

[8] United States v. Darby, 312 U.S. 100, 124, 125, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; Wilson v. United States, 221 U.S. 361, 380-382, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558;

Board of Trade of City of Chicago v. Olsen, 262 U.S. 1, 42, 43 S.Ct. 470, 67 L.Ed. 839; Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 208-216, 32 S.Ct. 436, 56 L.Ed. 729; Rodgers v. United States, 6 Cir., 138 F.2d 992, 995.

[9] Wilson v. United States, 221 U.S. 361, 380-382, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; Rodgers v. United States, 6 Cir., 138 F.2d 992, 995.

[10] Wilson v. United States, 221 U.S. 361, 382, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558; Fleming v. Montgomery Ward & Co., Inc., 7 Cir., 114 F. 2d 384, 388, 389.

from continuing to do business after the promulgation of § 16(b).

Moreover, § 205(f) (1) provides that the regulation or order may require "a license as a condition of selling any commodity or commodities with respect to which such regulation, order, or price schedule is applicable." It would seem, therefore, that the Administrator could not impose additional conditions in the license.

However, for reasons that will presently appear, we find it unnecessary to resolve the conflicting contentions of the parties.

■■ Ordinarily, a finding of the trial court on a controverted issue of fact will be followed on appeal, unless it is clearly erroneous. The reason underlying the rule is that the trial judge has had the opportunity of observing the witnesses while testifying and their demeanor on the witness stand and is in a better position to judge of their credibility. But, where the case is heard below on verified pleadings and affidavits, the reason for the rule is not present. On the contrary, the appellate court is equally capable of examining the evidence and drawing conclusions from it, and is under the duty of doing so.[11]

In support of the motion to suppress in No. 3040, Fairley, in his affidavit, averred that the investigators for the OPA demanded that Fairley show them the sales tickets for all merchandise sold by Beatrice from December, 1942, to date, and that he consented because he believed under the law he was compelled so to do. In the early part of his affidavit, Fairley stated that the demand was for sales tickets for all merchandise. Later in his affidavit, where the averments are more specific, he stated that the investigators demanded the right to inspect the sales tickets for poultry sold, and that he permitted them to examine the "sales tickets for poultry sold by Beatrice." In opposition to the motion to suppress in No. 3040, Royce and Lawson, in their affidavits, averred that they requested Fairley to be allowed to examine and copy the books, records, and other documents of Beatrice relating to poultry sales and particularly to sales and purchases of quick-

frozen and eviscerated poultry; that Fairley made no objection to the request and instructed Lengel to let them examine the records; and that Fairley and employees of Beatrice cooperated with and aided them in the examination of the records of poultry sales.

It is true that Fairley testified orally at the hearing, but his testimony corroborates, rather than refutes, the affidavits of the investigators that they requested permission to examine the records, rather than demanded that they be permitted so to do. Furthermore, the specific portions of Fairley's affidavit corroborate the affidavits of the investigators that their request was limited to the sales tickets for poultry sold.

Voerding, in his affidavit filed in No. 3041, averred that the investigators demanded that he make available to them his books, records, files, and papers, but in the latter part of his affidavit he stated that they "particularly demanded the production of affiant's books, records, files and papers pertaining to purchases of ice cream." Ankney and Blackburn, in their affidavits filed in No. 3041, averred that they requested, rather than demanded, permission to examine and inspect Voerding's base records and sales tickets relating to the sales of ice cream. Ankney averred that Voerding stated that all his records were there and Ankney was "free to look at them." Blackburn, in his affidavit, further averred, which averment Voerding did not deny, that Voerding consented to the inspection and examination after consulting counsel.

■■ We are of the opinion that the conclusion which must be drawn from the affidavits in No. 3040 and Fairley's oral testimony, which corroborates the affidavits of the investigators, is that the investigators requested permission to examine the sales records with respect to poultry sold and that Fairley freely and voluntarily consented thereto. Likewise, we think the conclusion which must be drawn from the affidavits in No. 3041 is that the investigators requested permission to examine the base period records and the sales records of prices charged for ice cream, and that

[11] British America Assur. Co. v. Bowen, 10 Cir., 134 F.2d 256, 260; United States v. Corporation of President, etc., 10 Cir., 101 F.2d 156, 160; Munro v. Smith, 1 Cir., 259 F. 1, 2, 3; Photoplay Pub. Co. v. La Verne Pub. Co., 3 Cir., 269 F. 730, 732; Nashua Mfg. Co. v. Berenzweig, 7 Cir., 39 F.2d 896, 897; Kaeser & Blair, Inc., v. Merchants' Ass'n, Inc., 6 Cir., 64 F.2d 575, 576; The Marsodak, 4 Cir., 94 F.2d 339, 341; Grove Laboratories v. Brewer & Co., 1 Cir., 103 F.2d 175, 178.

Voerding freely and voluntarily consented thereto.[12] Moreover, we think the conclusion which must be drawn from the affidavits in No. 3040 is that the request was for examination of the sales slips showing prices for sales of poultry and in No. 3041 the base period records and the sales slips showing the prices charged for ice cream, and that the respective requests were not too broad, but were properly limited to records relevant to the respective subjects of inquiry.

Accordingly, we hold that the requests were proper, that the records requested were pertinent and relevant to the respective inquiries, and that Beatrice and Voerding each consented to the examination and inspection.

The judgments are reversed and the causes remanded, with instructions to vacate the orders suppressing the evidence.

---

[12] Cf. Bowles v. Joseph Denunzio Fruit Co., D.C.Ky., 55 F.Supp. 9, 11, 12; Bowles v. Chew, D.C.Cal., 53 F.Supp. 787, 789, 790; A. Guckenheimer & Bros. Co. v. United States, 3 Cir., 3 F.2d 786, 789.