**UNITED STATES of America,**
**Plaintiff,**

v.

**Samuel I. FRIEDMAN et al., Defendants.**
**Cr. No. 310-58.**

United States District Court
D. New Jersey.
Oct. 22, 1958.

Chester A. Weidenburner, U. S. Atty., by Frederic C. Ritger, Jr., Asst. U. S. Atty., Newark, N. J., for plaintiff.

Anthony A. Calandra, Newark, N. J., for defendants.

MORRILL, District Judge.

This case involves a motion to suppress the use of certain evidence because it was seized unlawfully.

The first two counts of this indictment charge Samuel I. Friedman, Lawrence S. Friedman and Philip Friedman with receiving stolen tin ingots forming a part of and moving in foreign commerce, 18 U.S.C. § 659. The remaining two counts involve another person not concerned in this interlocutory proceeding. Samuel Friedman and Lawrence Friedman are the principal officers and the sole stockholders of Orchard Refining and Smelting Works, Inc., located in Newark, New Jersey; Philip Friedman is the plant foreman.

On June 5, 1958, about 2 p. m., the Newark office of the Federal Bureau of Investigation received notice that a quantity of tin ingots with certain markings were stolen in the State of New York. On June 6, 1958, about 8:30 p. m., the Bureau received an anonymous telephone call to the effect that the stolen ingots were at the plant of Orchard, that they could be converted quickly and that the converted ingots would be removed that night. In about one half hour thereafter, several agents of the Bureau were in automobiles in the vicinity of the plant, which was lighted and in operation.

Moments later, the lights were turned off and Philip Friedman and another employe left the Orchard premises, rode around the area, returned and the lights were on again. In about fifteen minutes these employes did the same thing, except that the lights were not immediately turned on after their return. In both instances they were followed by the agents. Philip Friedman knew he was being followed.

Consequent upon the second return to the plant by these two employes, the

agents entered through the plant gate, stating it was ajar and that no forcing of the gate was necessary, a fact disputed by witnesses for the defendants. Philip Friedman was accosted by the agents who identified themselves and notified him they were looking for stolen tin. Philip Friedman told the agents that there was some tin on the premises but did not tell them that it was then being worked on. Agents Hines and Doctoroff testified that they asked Philip Friedman if they could search the premises and that permission was given. (Philip Friedman did not contradict this testimony although he did testify that he refused to sign a written waiver regarding the search.) It is unquestioned that Philip Friedman was in charge of the plant that night. The search disclosed that some tin ingots with the markings in question were in the Orchard plant behind piles of scrap and that some of the ingots had been converted into smaller ingots without having these markings. Some ingots, converted and unconverted, and certain books and records were seized and removed by agents of the Bureau. It is uncontroverted that the search and seizure were not made pursuant to a warrant or as incidental to an arrest.

In this posture of affairs Samuel Friedman, the president and 50% shareholder, and Philip Friedman the plant foreman, jointly petition for the return to them of the books and records alleged to be their property, to suppress their use as evidence as well as any information or leads obtained from the search and seizure, and for the dismissal of the indictment because of their arrest subsequent to the search. At the hearing, petitioners conceded that the books and records were the property of the Orchard corporation and the prayers for relief, as stated in the petition, were abandoned. Petitioners were granted leave to amend their petition so that it would allege that the tin ingots were their property and pray for an order suppressing their use as evidence at the trial of this indictment.

Insofar as Philip Friedman is concerned, there was not a scintilla of testimony of any interest in the ingots on his part nor was any interest claimed other than in the formal petition. Samuel Friedman, on the other hand, asserts an interest in the ingots on the basis of the following testimony given by him: on the afternoon of June 5, one "W" asked him if he was ready to convert certain ingots they had previously spoken about; a conversion price of two and one-half cents per pound was fixed; since it was such a large quantity (about 47,000 pounds and worth about $50,000), "W" said he was going to hold Samuel Friedman personally responsible if anything happened to the ingots and he accepted the responsibility; it wasn't considered an Orchard transaction because of personal responsibility aspect; the transaction was not entered on the books and records of Orchard; and he did not know the tin had been stolen. From this, petitioners assert they have an interest in the tin, that the tin was in their possession, control and custody, and that they are proper parties-petitioners.

Yet Samuel Friedman also testified that: he had no interest in the tin; Philip Friedman and the other persons who were melting the tin on June 6th were employes of Orchard and were paid by Orchard; when the tin arrived at the Orchard plant it was handled and stored by Orchard employes; and the premises occupied by Orchard were owned by Superior Metal Company, another Friedman corporation. And petitioners conceded that the conversion of the tin was to be effected by Orchard.

The government seeks to support the search on these grounds: (1) the law enforcement officers had reasonable cause to suspect that the stolen tin was on the premises; (2) the exceptional circumstances (that the ingots were being converted into smaller pigs with consequent loss of identity by markings and size, and the imminence of removal) left no time to obtain a search warrant. The further contention is made that the peti-

tioners have no such interest in the tin on which to posit the relief sought. In view of my ruling on the latter point, which disposes of the entire matter, it is unnecessary to rule on the question of probable cause, for which see Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503; Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 or on the question of whether the permission to search given by the plant foreman constituted a sufficient and valid waiver of the privilege to object to what might otherwise be treated as an unlawful search, for which see United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, and compare United States v. Ruffner, D.C. Md., 51 F.2d 579.

In the Goldstein case, the Court said [316 U.S. 114, 62 S.Ct. 1004.]: "While this court has never been called upon to decide the point, the federal courts in numerous cases, and with unanimity, have denied standing to one not the victim of an unconstitutional search and seizure to object to the introduction in evidence of that which was seized." Thus testimony procured by a violation of the Federal Communications Act, 47 U.S.C.A. § 151 et seq. was not rendered inadmissible against a person not party to the message.

In our circuit, this rule of "no standing" has been frequently stated. A. Guckenheimer & Bros. Co. v. United States, 3 F.2d 786, certiorari denied 268 U.S. 688, 45 S.Ct. 509, 69 L.Ed. 1157; Newingham v. United States, 4 F.2d 490, certiorari denied 268 U.S. 703, 45 S.Ct. 638, 69 L.Ed. 1166; Chepo v. United States, 46 F.2d 70; Mello v. United States, 66 F.2d 135; United States v. One 1948 Cadillac, D.C.N.J., 115 F.Supp. 723.

" * * * it is clear that a question of lawfulness of a seizure can be raised only by one whose rights have been invaded. Certainly such a seizure, if unlawful, could not affect the constitutional rights of defendants whose property had not been seized or the privacy of whose homes had not been disturbed; nor could they claim for themselves the benefits of the Fourth Amendment when its violation, if any, was with reference to the rights of another." Guckenheimer, supra, 3 F.2d at page 789.

In the Chepo case, supra [46 F.2d 71], the defendant disclaimed any interest in the premises searched and in the goods there seized. "By that disclaimer he himself showed that no constitutional rights of his had been invaded and, therefore, that he is not in a position to attack the search and seizure."

"It has been consistently held in the various circuits that the guaranty of the Fourth Amendment against unreasonable search and seizure is a personal right or privilege, available only to one who claims ownership or possession of the property which has been subjected to the alleged unreasonable search or seizure", Mello, supra.

■ Immunity against the use of illegally obtained evidence cannot be claimed by the defendant if he does not own or have a proprietary interest in the property which is seized. Wharton, Criminal Evidence, § 700 (12th Ed.).

The same principle has been stated in Connolly v. Medalie, 2 Cir., 58 F.2d 629; Lagow v. United States, 2 Cir., 159 F.2d 245, certiorari denied 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865; Baskerville v. United States, 10 Cir., 227 F.2d 454; United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019; Casey v. United States, 9 Cir., 191 F.2d 1, reversed on the government's confession of unspecified error, 343 U.S. 808, 72 S.Ct. 999, 96 L.Ed. 1317.

In the Lagow case, supra [159 F.2d 246], the court said: "When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been

his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity." The court further held that F.R.Cr.P. 41(e), 18 U.S.C. did not change this long-standing principle.

■ The burden of proof is upon the petitioners to establish their proprietary interest. United States v. Pete, D.C.D. C., 111 F.Supp. 292. They have not sustained this burden.

■ The petitioners had no proprietary interest in the tin ingots. The ingots were stolen and it is a fundamental doctrine of the law of property that no one can give what he has not. Williston, Sales, § 311, Rev.Ed. It was even held in United States v. Pete, supra, that a defendant could assert no legal or equitable interest in embezzled property entrusted to a bailee or trustee. Nor are the defendants helped by United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96, 96 L.Ed. 59, because there, although there was a Congressional declaration that "no property rights shall exist" in contraband narcotics, the drugs were in reality owned by the defendant and he had asserted ownership of them.

■ But even if we assume that "W" had power to confer a proprietary interest in the tin ingots, then I find that such interest was intended to be transferred and was transferred to the Orchard corporation and not to Samuel Friedman. At the most, Friedman was a guarantor who made an oral promise to answer for the default of Orchard, and such questionable liability, see N.J.S.A. 25:1–5b, confers no proprietary interest in property. Although the petitioners were "interested" in the property, as they assert, this is a far cry from the type of proprietary interest required under the decisions.

■ The petitioners further base their proprietary interest on an alleged possessory interest which, they argue with some ingenuity, must be conceded by the government because the indictment accuses them of knowingly possessing the stolen ingots. This argument overlooks the fact that although the corporation was in actual possession of the ingots, these defendants may be punished as principals if they aided and abetted the corporation in the commission of the offense. 18 U.S.C. § 2.

The petition will be dismissed.