WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. HALLIBURTON OIL WELL CEMENTING CO.

No. 11041.

Circuit Court of Appeals, Ninth Circuit.
Dec. 29, 1945.

GARRECHT, Circuit Judge, dissenting.

William S. Tyson, Acting Sol., and Bessie Margolin, Asst. Sol., U. S. Dept. Labor, both of Washington, D. C., Dorothy M. Williams, Regional Atty., of San Francisco, Cal., and Joseph M. Stone, Atty., Wage and Hour Div., U. S. Dept. Labor, of Washington, D. C., for petitioner.

Ben F. Saye, of Duncan, Okl., Newlin & Ashburn, of Los Angeles, Cal. (Paul Sandmeyer, of Los Angeles, Cal., of counsel), for respondent.

Before GARRECHT, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellant sued under § 17 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., to enjoin claimed violations of the overtime provisions of the Act. The appeal is from a judgment denying injunctive relief and dismissing the complaint.

Appellee is engaged in cementing, testing, and surveying oil wells, renting tools and equipment to persons engaged in the drilling or operation thereof, and furnishing skilled employees to operate the equipment. It has field employees consisting of cementers, testers, and so forth, whose work is not at a fixed establishment but at wells in the field. These employees operate from camps located at varying distances from the scene of their work. Since the oil well must be cemented, tested, or surveyed at a time specified by the owner or operator, appellee has no control over the volume of work nor the time when it must be done. Much time on the job is spent by the men in simply waiting around. The employees who perform the services and operate the tools are trained men, and additional skilled labor is not obtainable in busy periods. The volume of work and the hours of employment fluctuate widely from week to week. In the slack periods the men are retained on the payroll. In some weeks the hours worked in the fashion described may exceed 100.

Prior to the effective date of the Act the field employees were paid on a monthly salary basis. In June 1942, after the decision of the Supreme Court in Walling v. A. H. Belo Corporation, 316 U. S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716, appellee by letter to its employees inaugurated the wage plan here under attack.[1] In August of that year each field employee executed a formal written employment contract. An excerpt from a typical example of these contracts will serve to disclose the nubbin of the controversy between appellee and the Administrator: "Employer agrees to employ Employee as a cementer and to pay Employee for his services a regular basic rate of 59 cents per hour for the first (40) hours of any workweek, and not less than one and one-half times such basic hourly rate of pay for all time over (40) hours in any workweek, with a guarantee that Employee shall receive for regular time and for such overtime as the necessities of the business may demand a sum not less than $63.46 for each workweek." The employee, under this arrangement, would be required to work 40 hours during any week at the hourly rate and an additional 44 hours at one and one-half times that rate before receiving any wages in excess of the minimum guarantee.

The question is whether the regular rate of pay is the hourly rate of 59 cents, as appellee contends, or whether it is the weekly guaranteed minimum of $63.46 as asserted by the Administrator. The trial court found that each of the contracts involved "was actually a bona fide contract of employment and was intended to and did really fix the regular rate at which each of the respective field employees was employed. Defendant agreed to employ and did employ, and each field employee agreed to be employed and was employed, at the hourly rate specified as the basic regular hourly rate in the written contract executed by the respective employees and defendant and in instances where the hourly rate was increased then at such increased hourly rate."

Faced with a wage agreement not substantially differing from the one before us, the Supreme Court, in Walling v. A. H. Belo Corporation, supra, reached a con-

---

[1] A similar plan had been put in effect after the adoption of the Fair Labor Standards Act, but it had been abandoned March 1, 1942.

clusion with which the decision below conforms. The Administrator· argues that in subsequent decisions [2] the Belo case has been whittled down to a very narrow compass. However, in these later cases the Court has carefully and consistently refrained from overruling the earlier decision or denying its continued authority. Counsel for the Administrator has not been able to point out any substantial distinction between the Belo case and the present, nor have we been able to discern any difference in principle.

Accordingly the judgment below must be affirmed.

GARRECHT, Circuit Judge (dissenting).

My associates have agreed to affirm the lower court in this case. Their determination is based on the decision of the Supreme Court in· the case of Walling v. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716. In that case, decided in June, 1942, the Court (by a 5-4 decision) approved a wage plan based upon written agreements between the parties which appeared to a majority of the Court to be a true statement of the understanding. A careful analysis of the Belo· case reveals that the Court was extremely careful to limit its decision to the precise facts and evidence in that case. It did not intend to set up a formula for other employers to follow in the future to facilitate evasion of the Act.

Since the Belo case, the Supreme Court has rejected similar, though not identical, wage plans as unrealistic and artificial.[1] And just recently, in the case of Walling v. Uhlmann Grain Co., decided October, 1945, 151 F.2d 381, the Seventh Circuit Court of Appeals (which, relying on the Belo decision, had originally approved the wage plan in the Harnischfeger case—later reversed by the .Supreme Court), upon a factual situation most similar to the case at bar, stated that in its opinion the Harnischfeger and Youngerman-Reynolds cases "effectively remove all grounds for relying upon the Belo case as controlling * * *. If the Supreme Court has not repudiated its holding in the Belo case, it has come so close as to leave no room for its applica-

tion except upon an identical state of facts." 151 F.2d p. 383.

In the case before us the evidence precludes a conclusion that the contract nomenclature represented a true statement of the understanding between the parties in the light of the Fair Labor Standards Act. It is important that we analyze the contracts in the light of all the evidence. Several days after the Supreme Court decided the Belo case the company notified each employee of that decision and proceeded to set out a wage plan whereby the employees' regular salary was denominated a "guaranty" and a formula was devised to calculate an alleged "hourly rate." In a· mimeographed bulletin outlining the rules to be followed by field employees (those here under consideration), the company stated that "irregular hour field employees are now working and will continue to work on a *monthly minimum salary basis;* however, for contract purposes, the monthly salary is reduced to an equivalent *weekly salary.*" When a "contract" employee was absent from work he was docked for days off, not at the alleged "hourly rate," but at a figure determined by reducing the monthly base salary to a daily rate and and multiplying by the number of days lost. Thus, the absentee was docked not on the basis of his alleged "hourly rate" but on the basis of the proportionate amount of his monthly or weekly salary.

In my judgment, the contracts fixing "weekly guarantees" were for weekly wages, for variable hours. That is a realistic conclusion. The arbitrary hourly rates written into the contracts are fictitious and unrelated to the facts and the evidence. It is clear here that the employees received the same weekly wages in many weeks during which they worked no overtime, and it is fantastic to presume that the weekly wages in those weeks in which they worked only a few hours—much less than 40— might have included extra compensation for overtime. It is clear also that the "basic hourly rate was fixed so that each employee * * * may work a total of 84 hours in any single workweek before receiving compensation in excess of the guar-

---

[2] Walling v. Helmerich & Payne, 323 U.S. 37, 65 S.Ct. 11; Walling v. Harnischfeger Corp., 325 U.S. 427, 437, 65 S.Ct. 1246; Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 65 S.Ct. 1242.

[1] Walling v. Youngerman-Reynolds Hardware Co., decided June, 1945, 325 U.S. 419, 65 S.Ct. 1242; Walling v. Harnischfeger Corporation, decided June, 1945, 325 U.S. 427, 65 S.Ct. 1246; Walling v. Helmerich & Payne, decided November, 1944, 323 U.S. 37, 65 S.Ct. 11.

anteed weekly salary" [Exhibit C], although that arbitrarily chosen 84 hour week bore no relation to the regular or usual number of hours worked by the employees under consideration.

In order to determine the true regular hourly rate in these cases, we have only to divide the weekly wage (or guaranty as the contracts term it) by the number of hours worked in each week, thus arriving at the regular hourly rate for each workweek. The hourly rate may vary for each workweek—in relation to the number of hours worked. That is not inconsistent with the provisions and purposes of the Act. In my opinion the "hourly rates" fixed in the contracts in this case were fictitious and calculated merely to retain the employer's prestatutory costs. In passing this Act Congress intended that it shall be costly for an employer to work his employees more than the maximum hours fixed therein. To approve a scheme calculated to pay the very same weekly wage regardless of the number of overtime hours worked would be to encourage circumvention of the Statute and its purposes.

In my opinion the case should be reversed.