KUPPERMAN v. M. & J. BECKER, Inc.

No. 209, Docket 22228.

United States Court of Appeals,
Second Circuit.

Submitted April 8, 1952.

Decided Aug. 15, 1952.

Clark, Circuit Judge, dissented.

Irving Rozen, New York City, for plaintiff-appellant.

Morris M. Marcus, New York City, Friedman & Friedman, Brooklyn, N. Y., for defendant-appellee.

Before CHASE, BIGGS, and CLARK, Circuit Judges.

BIGGS, Circuit Judge.

On September 4, 1947, the plaintiff, Kupperman, brought suit in the court below to recover from his employer, the defendant, M. & J. Becker, Inc., a New York City manufacturer of hats and caps, overtime wages alleged to be due him and an additional equal amount by way of liquidated damages, pursuant to Section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216. Jurisdiction was founded on Section 16(b) of the Act and on 28 U.S.C. § 1337.[1] The defendant interposed as its principal defense the contention that Kupperman fell within the exemptions of Section 13 of the Act, 29 U.S.C.A. § 213, which provide that "(a) The provisions of sections 206 and 207 [2] of this title shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by

1. It was stipulated by the parties that M. & J. Becker, Inc. was a corporation engaged in interstate commerce.

2. Relating to maximum hours and overtime.

regulations of the Administrator [3]". The defendant's position was and is that Kupperman at all times was employed by it in a bona fide executive capacity within the meaning of the exemption provided by Congress in the statute and as defined by the Administrator.

The complaint sought recovery fo the whole period of the plaintiff's employment by the defendant, commencing in the third week of April 1939 and ending in August 1947. The court below restricted recovery, if there should be any, to the period commencing September 4, 1941, the earliest effective date within New York's six-year statute of limitations. See N. Y. Civil Practice Act, Section 48.[4] A further restriction on the period involved was imposed when it appeared from the evidence that in May 1945 Kupperman had become a union employee and had renounced all claim to unpaid overtime wages earned thereafter.

The court below, as the trier of the facts,[5] concluded that the defendant had met the burden imposed on it to prove that the plaintiff was employed in a bona fide executive capacity as defined by the Administrator, Wages and Hours Division, United States Department of Labor, during the period September 4, 1941 to May 1945.[6] The court took the position that the defendant had the obligation to, and did, prove that the plaintiff's employment fell within each and every requirement of an "executive" as required by the Administrator's Regulations, Section 541.1, 29 U.S.C.A. Appendix, § 541.1. See Fanelli v. United States Gypsum Co., 2 Cir., 141 F.2d 216; Stanger v. Vocafilm Corp., 2 Cir., 151 F. 2d 894, 162 A.L.R. 216; McComb v. Utica Knitting Co., 2 Cir., 164 F.2d 670. We set forth the requirements of the pertinent Regulations in the margin.[7] The court below entered judgment in favor of the defendant, and the appeal at bar followed.

3. *Administrator, Wages and Hours Division, United States Department of Labor.*

4. The two year statute of limitations of the Portal-to-Portal Act does not apply. See 29 U.S.C.A. § 255(c). There is no issue as to any statute of limitations.

5. Trial was had to the court.

6. No opinion for publication.

7. Regulations, Section 541(1), 29 U.S.C.A. Appendix, provides and provided (with the exception of subparagraph (f)) as follows:

"The term 'employee employed in a bona fide executive * * * capacity' in section 13(a) (1) of the act shall mean any employee:

"(a) Whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; and

"(b) Who customarily and regularly directs the work of two or more other employees therein; and

"(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

"(d) Who customarily and regularly exercises discretionary powers; and

"(e) Who does not devote more than 20 percent of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section: *Provided,* That this paragraph shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; and

"(f) Who is compensated for his services on a salary basis at a rate of not less than $55 per week (or $30 per week if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities:

"*Provided,* That an employee who is compensated on a salary basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all of the requirements of this section."

It will be noted that the provision of subparagraph "(f)," supra, quoted supra, states that the salary of one who is to be considered an "executive" must amount to

The only substantial question before us is whether the court below has made the necessary findings of fact and whether any finding of fact was clearly erroneous. See Rule 52(a), Fed.Rules Civ.Proc. 28 U.S. C.A., and McComb v. Utica Knitting Co., supra.

The plaintiff testified that in April 1939 he was unemployed and on relief; that in the latter part of April he commenced work at the defendant's place of business at 2961 Atlantic Avenue, Brooklyn; and that he continued there throughout the period here in question. Kupperman further stated that in 1941 he was employed by the defendant in its "Parkahood" department, existing on the lower warehouse floor of the building occupied in part by the defendant, and that he was subsequently moved upstairs to its principal "Cap-making" department late in 1942 when the defendant stopped making parkahoods. The plaintiff said that he was a cutter of caps by trade, and testified to long hours of weekday and weekend overtime employment as a cutter. He admitted, however, that on the lower warehouse floor he handed out work to women there employed as cutters and kept the records of their employment; that the defendant was organized as a union shop and that its employees were required to punch time cards; that he, Kupperman, did not join a union until May 1945, when, for the first time, he was issued a time card; and that he was on such terms with Jacob Becker, the president of defendant, that he received several Christmas bonuses and rode home from work each day in President Becker's automobile.

Kupperman also asserted that the records of the defendant surely had been falsified since he was listed therein as a foreman and shown to have worked only a 40 hour week. On cross-examination the plaintiff admitted

that he had received a sum of money in settlement of a suit he had brought in the Municipal Court of New York against Bushwick Mills, Inc. for wages for August through October 1942. He explained that he was promised compensation by Bushwick Mills to speed performance by the defendant of a contract to make army caps.[8] The plaintiff testified that he had brought suit against Bushwick Mills, Inc. because "Mr. Becker said to me, 'I am on the outs with [Bushwick Mills, Inc.] and I would like to get even with Margolin.'"[9] and because "At the time I was really mad. I was not getting the money."

Licato, an operator of a sewing machine on the defendant's lower floor, testified that Kupperman was employed on that floor to "* * * take care of the girls, and he used to cut out work once in a while." Licato also said that the plaintiff assigned work to the women employees, kept records, gave out payroll envelopes, was consulted about complaints, and that she was in fact hired by him.

President Becker testified that he had hired Kupperman "to be a foreman," that "He came up to manage the place," and that a cutter was not in fact needed. Becker stated that the plaintiff hired and fired the "Parkahood" girls, and fixed their wages; that Kupperman rarely worked after the usual quitting time of 5:00 P.M.[10] and then came upstairs to wait for his ride home; and that he received pay for his occasional weekend work at Ozone Park where Becker had another place of business, or was paid by Bushwick Mills, Inc., and for his Sunday work at 2961 Atlantic Avenue during August through October 1942. Becker testified that the plaintiff also received pay for periods when he was sick and did not work, which would not have been the case had he been employed by the hour; that throughout the period

not less than "$55. per week." At the time the suit was filed and the plaintiff was first employed the amount required was $30. a week. The increase in the amount was effected December 24, 1949. See 14 F.R. 7705–6.

8. Bushwick Mills, Inc. was the prime Government contractor under contract for the manufacture of caps for the United

States Army. The defendant was a subcontractor thereunder.

9. Margolin apparently was employed in some executive capacity at Bushwick Mills, Inc. He is not otherwise identified in the record.

10. Becker stated that Kupperman worked an extra half-hour "maybe once a year."

in question Kupperman remained free of the union because he was a foreman; and that it was for this reason that the plaintiff was entitled to bonuses. Becker explained that when the plaintiff moved upstairs from the "Parkahood" department he "helped the foreman," "[gave out] the goods to cut," "walked around the floor," "watch[ed] * * * the packing," and only worked at cutting "a couple of times a week, a couple of hours a day." Becker also stated that when the plaintiff moved upstairs he served as co-foreman with Steinberg, conceded by all to have been a foreman.[11]

Steinberg testified that the plaintiff "prepared the material for the cutters" and that he did not remember seeing the plaintiff himself employed in cutting at any time. This testimony was corroborated by Brown, a cutter, who indicated that the plaintiff was not needed as a cutter, for he, Brown, by operating a "clicker" machine was, together with other cutters, able to supply sufficient cut goods for the sewers. Schurman, bookkeeper and sister-in-law to Becker, stated in further corroboration that Kupperman was a foreman and not a cutter and that her records were correct in showing that he had not earned compensable overtime.

 The foregoing is ample to support the following findings of fact made by the court below:

"9. Plaintiff in many instances remained after working hours for the sole purpose of obtaining a ride home in the automobile of Becker, his employer.

"10. Plaintiff never spent any considerable time at defendant's establishment on Saturdays or Sundays or before office hours, except possibly to lay out work for the other employees to do.

"11. Plaintiff's primary duty consisted in the management at first of the so-called Parka hood department on the first floor, and afterwards as foreman on the upper floor.

"12. As part of his duties plaintiff customarily and regularly directed the work of several employees. Plaintiff also had the right to hire and fire employees and he customarily and regularly exercised discretionary power.

"14. Plaintiff did some cutting from time to time but the time spent on such activity amounted to only a very small fraction (less than 20 per cent) of the time spent on other duties."

██ It will be observed, therefore, that the court below, item by item, has made all necessary findings, save one, as to the qualifications of an executive as required by the Regulations, paragraphs (a) through (f), Section 541.1, 29 U.S.C.A. See footnote 7, supra. There was ample evidence to support the findings made. Indeed, the weight of the evidence appears to favor the defendant's contentions for, as noted by the court below, the fact that the plaintiff did not join the union until 1945, a date lying outside the period with which we are concerned, is very persuasive. It was indeed unlikely that Kupperman's tasks became less managerial in character when he was moved to the defendant's principal manufacturing floor for his salary continued to rise steadily.[12]

But *one* essential finding was not made by the court below, viz., that relating to the plaintiff's salary rates throughout the whole of the critical period. If the plaintiff received less than $30 a week he would not fall within the purview of earlier subparagraph "(f)," applicable during the period with which we are concerned. See 5 F.R.

11. According to the payroll records of Becker, Inc., Defendant's Exhibit C, Steinberg's salary was at all times less than Kupperman's. For example, for the week ending September 4, 1943, Steinberg earned $50 as compared to Kupperman's $65.

12. We are not unmindful of the fact that Hershkovitz, Manager, Capmakers' Union, Local No. 2, which local had jurisdiction at the defendant's shop between 1941 and 1946, stated that he found the plaintiff employed in cutting on one occasion in 1943 and had told both Becker and the plaintiff that the latter " * * * would have to join the union." Hershkovitz testified to the response to this demand as follows: "And both told me— both Kupperman and Becker told me: Well, he was a foreman. And so did Kupperman."

4077. The change in the regulation was effected December 24, 1949 and therefore is not pertinent here. See note 7, supra. It is abundantly clear from the testimony on these points, however, that the plaintiff's salary rates were at all times within the required limitations of earlier subparagraph "(f)." We set them forth in the margin.[13] To sum this point up we state that there would seem to be no doubt that the plaintiff received at least no less than the amount specified by subparagraph (f). We cannot, however, make the necessary finding since as an appellate tribunal we are without the power to do so.

Accordingly the judgment of the court below is vacated and the cause remanded. If the court below shall find that the evidence is sufficient to support the finding which we have indicated should be made, the trial judge will possess the authority to make such a finding and re-enter judgment in favor of the defendant.

CLARK, Circuit Judge (dissenting).

My brethren are approaching this case as one resting completely upon fact findings made by the district court after a contested trial, and affirmance is based upon the recital of various small excerpts of evidence adduced in support of the decision. But this, as I see it, gives no picture whatsoever of the total situation and thus does not disentangle from the *minutiae* the overriding problem whether this small hat manufactory, already teeming with executives, can honestly support one more, or whether plaintiff's claimed high position is not due more to the escape thus achieved from the minimum wage scale set by the Fair Labor Standards Act. There is a canard that during the depression years of the 30s young law clerks acquired partnership status more rapidly than before because of the need for their help in paying the office rent. Plaintiff's functions in this shop seem to bear some analogies. This suggestion receives added force from the exploitation, here and below, of an aroma of unattractiveness about the plaintiff and his background and habits. True, this is somewhat inconsistent with the ultimate conclusion; the more unattractive he is painted by the defendant, the less likely would it seem that he would be one of its executives. Thus the fact that he was taken off relief to receive his job, if relevant at all, would tend to belittle, rather than enhance, his resulting status. But all this, it seems to me, has little bearing to show the plaintiff's claim unworthy of credence, since it does not touch the fundamentals of the issue before us. Beyond that it can have no point; social welfare legislation in general, if not actually designed to protect the weak sisters of our economy, certainly has an important

---

13. The pertinent portion of Plaintiff's Exhibit 1 in the court below shows the following:
 "Weekly Earnings of George Kupperman:
 * * *

| | | |
|---|---|---|
| Nov. 22 1940 to March 7 1942 | 40 | 00 |
| March 14 1942 to July 4 1942 | 45 | 00 |
| July 11 1942 to March 27 1943 | 55 | 00—and |

 collecting money from Bushwick Mills

| | | |
|---|---|---|
| April 3 1943 to July 10 1943 | 60 | 00 |
| July 17 1943 to May 12 1945 | 65 | 00 |

Left our employ May 12 1945, demanding a $375.00 bond for bonus. Re-hired May 26 on Union insistence that he become a Union cutter.
 * * *

Extras:

| | | | |
|---|---|---|---|
| Dec. | 22 1942 | 50 00 | Bonus |
| Sept. | 23 1943 | 50 00 | " |
| Dec. | 23 1943 | 63 13 | " |
| June | 23 1944 | 100 00) | to be deducted |
| June | 2 1944 | 100 00) | out from June 3 to June 30 1944 |
| Dec. | 22 1944 | 86 20 | Bonus |
| Dec. | 24 1945 | 100 00 | Loan not repaid |
| Jan. | 23 1945 to May 1st 1945—$10.00 weekly." | | |

effect in doing just that, and courts are not to oppose their will to the trend.

Let me hasten to add that I am not much troubled by the labels "fact" and "law," and believe an appellate court in cases of this type must reach behind such formulae to state and execute the justice which the issue demands. So, were it necessary, I should not for a moment draw back from that conviction of mistake which the Supreme Court holds requisite for a reversal of fact findings. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746; Gindorff v. Prince, 2 Cir., 189 F.2d 897. But for the record I must point out that the error I find seems to me more of law in a failure to enforce the Administrative Regulations according to their terms and the several previous decisions of this court than of incorrect resolution of factual disputes. While there were such disputes, I can think of none at all decisive on the points I deem important; giving every effect to the trial court's resolution of these disputes in favor of the defendant, I yet do not see how this workman can be made into an executive under any realistic application of the governing law.

The Administrative Regulations, which the opinion herewith cites and quotes, establish six indicia of "executive capacity" as used in § 13(a)(1). We have said, time and again in this Circuit in the cases the opinion cites, that it is the employer's duty to establish exemption within each of these terms and that unless he comes forward with definite and clear evidence proving all six he must fail. Defendant was not held to this standard of proof. We have from it little more than President Becker's own meaningless and self-serving statements that Kupperman was a "foreman."[1] Labels like this, however, are legally insufficient and the question remains one to be determined by applying specifically the six requirements of the Regulations as to the type of work performed and the time spent on various duties. With the law thus stated plaintiff appears far from an "executive."

Plaintiff's duties, like the whole operation of the shop, were rather haphazardly and arbitrarily assigned. After 1942, for instance, when he was working upstairs, there were at least three others directing and supervising operations, while the entire staff (workers and directors) appears to have averaged about sixteen people. To me it seems fantastic to assume that plaintiff was called upstairs to direct an operation already top-heavy with executives— to make the ratio one to three instead of one to four. The evidence indicates that, in fact, there was no real differentiation between management and labor—as is to be expected from what is generally known of the operation of the garment industry. The shop was small with few people engaged; all knew the skills involved in turning out the goods; and all could, and surely did, fill in when needed on the machines. Plaintiff, at best, may have been a higher- or midway-up employee; he probably had some power, by tradition, in a shop largely staffed with women, to direct some operations. This alone is not enough to make him an "executive" within the Act unless the stern requirements of § 13 and the Regulations are diluted beyond recognition. We are certainly making extensive new law when we say a hybrid job like this, partly directive, partly not, is exempt.

Indeed, the whole agglomerate of facts we have before us requires the conclusion that he was not exempt within the terms of the Regulations. Subdiv. (e), for instance, requires that, for exemption, not more than one-fifth of an employee's time be spent on non-exempt work. Now we have nothing entirely definite on just how many hours each day plaintiff spent on his various duties. (In fact one witness stated he spent all his time preparing material.) We do know, on the basis of Becker's own testimony, that plaintiff did some cutting of the material—certainly non-executive work—and all the circumstantial evidence points to the conclusion that the time thus

---

1. Becker himself left no doubt about the meaninglessness of this definition of Kupperman's job. He stated in his deposi-

tion, "Well, we hired him for handyman and for foreman. That is the same thing to me."

spent was significant. So it appears that when he was hired in 1939, he was by training and experience a cutter. At this time there were three people engaged in cutting the material for the entire shop, but shortly thereafter two left defendant's employ. From 1941 on there was only one admitted cutter unless plaintiff materially assisted him, as to me seems clear. And finally, after 1945, when he joined the union, all admit that plaintiff was a cutter primarily and there is no evidence that the management suddenly altered his duties on that date. As a matter of law, defendant has failed to satisfy the burden of proof it bears on an essential condition of its exemption defense. Judgment should therefore go for the plaintiff.

If I am wrong as to all this, I should think the remand ordered by my brethren unnecessary and therefore quite undesirable. Pat and perfect findings of fact are not imperative for a valid judgment and the mere fact that the Regulations establish certain indicia of necessary proof for recovery should not require formalistic symbols addressed to each one. Where the trial judge's intent is as clear as it was here, we should accept the result as including the formal finding which, on his view, cannot be questioned. Courts, appellate and trial, should not move in entirely disconnected concentric circles, touching only to cause damage to the rhythm of procedure; they should enmesh together to form a workable whole. This result goes beyond the desirable elements of F.R. 52(a) to find requirements therein of no affirmative utility, but of artificial procedural strictness, barring easy operability of the system.